**Deanna L. BEARD, Plaintiff,**

v.

**FLYING J. INC. and Richard Krout, Defendants.**

**No. 3–98–CV–90106.**

United States District Court,
S.D. Iowa,
Davenport Division.

Sept. 8, 2000.

Jeffrey S. Bittner, Davenport, IA, for Plaintiff.

Mark A Pihart, Davenport, IA, Jean Dickson Feeney, Davenport, IA, for Defendants.

## ORDER

PRATT, District Judge.

Before the Court are five post-trial motions and requests filed by the parties in this case. In the order they will be addressed, they are: (1) Plaintiff's "Amended Motion for New Trial on Constructive Discharge Claim" filed June 29, 2000 (Clerk's # 156); (2) Defendant Flying J. Inc.'s ("Flying J") "Motion for Judgment as a Matter of Law and New Trial" filed June 27, 2000 (Clerk's # 154) [1]; (3) Defendant Richard Krout's ("Krout") "Motion for Judgment as a Matter of Law, Motion for Amendment of Judgment, Motion to Reinstate Original Verdict and Entry of Judgment as Matter of Law, and Alternative Motion for New Trial" filed June 26, 2000 (Clerk's # 150); (4) Plaintiff's Bill of Costs filed June 30, 2000 (Clerk's # 163); and (5) Plaintiff's "Submission of Attorney's Fee Bill on Sexually Hostile Environment Claim" filed June 30, 2000 (Clerk's # 164). Each named party has separately filed a resistance and reply to the motions, bill of costs, and request for attorney's fees. With the exception of Clerk's # 164, the matter is considered fully submitted.

## I. Factual and procedural background

This is an employment discrimination case brought by Plaintiff Deanna L. Beard ("Beard") against her former employer Defendant Flying J. Inc. ("Flying J") and former supervisor Defendant Richard Krout ("Krout"). Flying J operates travel plazas throughout the United States and Canada. A travel plaza consists of a restaurant, convenience store, and a filling station.

Beard was employed at the Flying J restaurant in Davenport, Iowa from 1994 to May 20, 1998. During the last two years of her employment, Beard was the restaurant's assistant manager. Krout served as the restaurant's general manager from January 1998 through August of 1998. Krout was Beard's supervisor.

Krout's harassment of Beard allegedly began sometime in February of 1998 and continued through April or May of 1998. Beard accused Krout of inappropriate sexual contact with her breasts on numerous occasions. On May 5, 1998, Flying J's district manager, Mike Snider, drove from his office in Omaha, Nebraska to the Davenport restaurant to investigate Beard's allegations of sexual harassment against Krout. Snider conducted a limited investigation, interviewing only Beard and Krout. After speaking with them separately, Beard and Krout both signed a one-page statement, the last lines of which declared: "At this time Rich is fully aware that this behavior shall cease and desist from this day forward, and if any other substantiated charge of this type occurs, further disciplinary action will result.... Deanna is satisfied with the results of this action." Pl.'s Ex. 5. Beard did not complain of further inappropriate sexual contact with Krout after May 5, 1998.

Mike Snider returned to the Davenport restaurant on May 16, 1998 to investigate another employee's complaints against Krout. This time, Snider interviewed many employees. These employees stated to Snider that Krout frequently would engage in sexually inappropriate language and conduct. Snider memorialized these interviews in a typed, six-page, single

---

1. Flying J also filed, but did not brief, a "Motion to Alter or Amend Judgment" on June 27, 2000 (Clerk's # 153). There is no indication from the motion itself what Flying J seeks through this motion. The Court will not devote any further discussion to Clerk's # 153.

spaced document. *See* Pl.'s Ex. 1. Krout was given a 1–day paid suspension. On May 20, 1998 Krout was permitted to resume his duties as general manager of the restaurant. On the same day, Plaintiff quit. She filed suit shortly thereafter. As necessary, the Court will provide additional facts and details.

From June 12 to June 15, 2000 in Davenport, Iowa, a twelve person jury heard Beard's claims brought pursuant to Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, Iowa Code Chapter 216 *et seq*, and Iowa common law:

1. Beard's claim of sexual harassment against both Flying J and Krout;

2. Beard's claim of constructive discharge against Flying J;

3. Flying J's affirmative defense as set forth in *Faragher v. City of Boca Raton*, 524 U.S. 775, 805–07, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 763, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998);

4. Beard's claim of assault against Krout;

5. Beard's claim of battery against Krout.

At the close of Plaintiff's case-in-chief, and again before the case was submitted to the jury, both Flying J and Krout moved for a judgment as a matter of law as to all claims asserted by Beard. The Defendants' motions were denied.

On June 15, 2000, the Court submitted the case to the jury. The jury returned a verdict which the Court found to be inconsistent. The jury found that Beard had not proven her sexually hostile work environment claim and her constructive discharge claim, yet it nevertheless determined that Flying J failed to prove its affirmative defense and went on to assess compensatory and punitive damages against Flying J. Stated differently, after finding Flying J and Krout not liable on the sexual harassment claim, the jury should not have reached the merits of the affirmative defense. But it did, and went on to award Plaintiff $12,500 in compensatory damages and $12,500 in punitive damages as against Flying J. This split verdict against Flying J concerned the Court as it suggested an intention to hold Flying J liable on the charge of sexual harassment. (As to Krout, the jury absolved him of sexual harassment liability under Iowa Code Chapter 216 and awarded Plaintiff zero damages. This aspect of the first verdict as to Krout was not inconsistent, and therefore will not be disturbed.)

■ There was a second *perceived* inconsistency in the first verdict in that the jury awarded Plaintiff $10,000 in punitive damages on her state battery claim without awarding any compensatory damages. The Court believed that a jury had to award compensatory damages before it could award punitive damages. An examination of Iowa law reveals that this is not necessarily the case.[2]

The jury determined that Beard did not prove her assault case against Krout, and therefore it did not award any damages on that claim. Thus, the jury's first verdict as to the assault claim will not be disturbed.

*See Westway Trading Corp. v. River Terminal Corp.*, 314 N.W.2d 398, 404 (Iowa 1982) ("Therefore we hold that a failure to award actual damages will not bar exemplary damages when actual damage has in fact been shown.") (citation omitted). "[O]ur primary focus in review of a punitive damage award is the relationship between the punitive damage award and the wrongful conduct of the offending party." *Ryan v. Arneson*, 422 N.W.2d 491, 496 (Iowa 1988).

---

**2.** The Iowa cases make clear that an award of actual damages is not a prerequisite to an award of punitive (or exemplary) damages. *See Hockenberg Equipment Co. v. Hockenberg's Equipment & Supply Co. of Des Moines, Inc.*, 510 N.W.2d 153, 156 (Iowa 1993) (citing *Pringle Tax Serv., Inc. v. Knoblauch*, 282 N.W.2d 151, 154 (Iowa 1979)) ("An award of actual damages, however, is not necessary to support an award of punitive damages."). All that is needed before punitive damages can be awarded is some showing of actual damages.

Based on the inconsistency regarding the sexual harassment claim as against Flying J and the perceived inconsistency regarding Plaintiff's battery claim, the Court resubmitted the verdict form. On this second verdict form, the Court made some minor formatting changes and added some clarifying comments under each interrogatory. On this second verdict, the jury found in favor of Beard on her sexual harassment claim as against Flying J.[3] The jury repeated its award of damages, awarding Plaintiff $12,500 in compensatory and $12,500 in punitive damages as against Flying J. As before, the jury again found that Plaintiff had not proven her claim of constructive discharge. And as with the first verdict, the jury found that Beard did not prove her assault claim against Krout. On Plaintiff's battery claim, the jury again found Krout liable, though it apportioned damages differently. Consistent with the instruction the Court added to the this second verdict form,[4] the jury awarded Plaintiff $5,000 in compensatory damages and $5,000 in punitive damages, for a total damage award of $10,000. Seeing no reason to question the jury's second finding, the Court adopts the jury's award of $5,000 in compensatory and $5,000 in punitive damages assessed against Krout on Plaintiff's battery claim.

In summary, reading the first and second verdicts together, the jury made the following findings:

1. Plaintiff succeeded on her sexually hostile work environment claim against Flying J and was awarded $12,500 in compensatory and $12,500 in punitive damages. Plaintiff did not succeed in proving sexual harassment against her supervisor Richard Krout and thus was not awarded any damages under this claim.

2. Plaintiff did not succeed on her claim of constructive discharge as against Flying J.

3. Flying J did not succeed in its affirmative defense.

4. Plaintiff did not succeed on her assault claim against Krout.

5. Plaintiff succeeded on her battery claim against Krout awarding her $5,000 in compensatory and $5,000 in punitive damages.

The Court will address the instant post-trial motions/requests with this outcome of the case in mind.

## II. Standards for judgment as a matter of law and new trial

### A. Judgment as a matter of law

The statute appertaining to a judgment as a matter of law is set forth in Rule 50 of the Federal Civil Rules of Civil Procedure. Rule 50(a)(1) provides in relevant part:

If during a trial by jury a party has been fully heard on an issue and there is *no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue,* the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

Rule 50(b) provides that the "movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment."

Under Rule 50, "the court should review all of the evidence in the record." *Reeves*

---

3. The jury also found Krout liable for sexual harassment and therefore awarded Plaintiff $2,000 in compensatory damages as against Krout. The Court will disregard this determination as to liability and damages and enter judgment on the first verdict under which Krout was found not liable for sexual harassment.

4. Under the interrogatory corresponding to Plaintiff's battery claim, the Court added the following instruction next to the line for punitive damages: **"Only award punitive damages if you have awarded compensatory damages."** (emphasis in original).

*v. Sanderson Plumbing Prod., Inc.,* —— U.S. ——, ——, 120 S.Ct. 2097, 2110, 147 L.Ed.2d 105 (2000). In so doing, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Id.* (citations omitted). The nonmoving party is only entitled to the benefit of "reasonable inferences," meaning inferences "drawn from the evidence without resort to speculation." *Kinserlow v. CMI Corp.,* 217 F.3d 1021, 1026 (8th Cir.2000) (citation and quotation marks omitted). "The court should grant judgment as a matter of law only when all of the evidence points one way and is susceptible of no reasonable inference sustaining the position of the nonmoving party." *Id.* (citation and quotation marks omitted).

## B. New trial

Rule 59 provides the statutory basis for granting a new trial. "A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States...." Fed.R.Civ.P. 59(a). The standard to use when granting a new trial is "whether a miscarriage of justice has occurred." *White v. Pence,* 961 F.2d 776, 780 (8th Cir.1992). "The jury's verdict must at least be against the great weight of the evidence before a new trial may be granted." *Id.* Such a high standard safeguards "the role of the jury as the principal trier of the facts,"*id.,* and prevents the trial judge from "disregard[ing] the jury's verdict at will,"*id.* at 780.

## III. Discussion

On a number of issues which the Court will address shortly, Flying J and Krout each timely move for judgment as a matter of law and a new trial. Beard timely moves for a new trial solely on her claim of constructive discharge. The Court will address Beard's motion for a new trial first and then address Flying J's and Krout's respective motions.

## A. Plaintiff's motion for new trial

Plaintiff bases her motion for a new trial on the claim of constructive discharge on four grounds. As explained below, the Court rejects these reasons and denies Plaintiff's motion for a new trial.

### 1. Instructions on co-employee harassment

First, Plaintiff argues that the jury was inadequately instructed on how to use evidence of co-employee harassment—i.e., harassment experienced not by Plaintiff but by her fellow co-workers. Under Eighth Circuit authority, *see, e.g., White v. Honeywell,* 141 F.3d 1270 (8th Cir.1998), the Court ruled such evidence admissible prior to the start of trial. Beard objects to the Court's decision not to incorporate three of her proposed final jury instructions into the Court's final instructions given to the jury. In substance, these proposed instructions teach that evidence of co-employee harassment, even if not directed at, or experienced by, Plaintiff, can nevertheless be admitted to help prove claims of constructive discharge and hostile work environment. *See* Pl.'s Proposed Final Instruction Nos. 6–8. Plaintiff argues that without these instructions, "the jury thought that they could only consider what Mr. Krout had done to Mrs. Beard." Pl.'s Memo. of Law in Supp. of Her Amended Mot. for New Trial on Constructive Discharge Claim at 4.

 The Court believes that the jury was adequately instructed on the issue of constructive discharge, and that evidence of co-employee harassment was properly considered by the jury. On several occasions during trial, the Court explained to the jury that it could use evidence of co-employee harassment when deciding the claims against Flying J. *See, e.g.,* 2 Trial Tr. at 167 (jury instructed that testimony of Christie Ferring was "admissible against Flying J, not Mr. Krout"); 2 Trial Tr. at 210 (testimony of Lyle Straw "admitted against Flying J, not against Mr. Krout"); 2 Trial Tr. at 320 (testimony of

Mike Snider "admissible against Flying J, but not Mr. Krout"). Moreover, the final instruction the Court gave on Plaintiff's claim of constructive discharge refutes the assertion that the jury could only consider what Mr. Krout had done to Mrs. Beard. The Court instructed the jury that in order for Plaintiff to win her claim of constructive discharge, she had to prove, *inter alia*, that "*Flying J* made Mrs. Beard's working conditions intolerable." Final Instruction No. 3 (emphasis added). Below this element, the Court noted that the "conditions created by the *employer* must be such that a reasonable person would find them intolerable, not simply that the plaintiff found them intolerable." *Id.* (emphasis added). Final Instruction No. 3, in other words, properly focused the jury's attention on "conditions" that were "created by the employer" which made Plaintiff's workplace intolerable. Both during the trial and in closing arguments, the Plaintiff argued that evidence of Krout's harassing conduct toward Plaintiff's co-employees helped to prove Plaintiff's claims against the company. As Beard herself concedes: "There was an abundance of co-worker testimony which clearly established other conduct which created a sexually hostile environment. The testimony of Christie Ferring, Wendy Crabtree [Cervantes] and Carmen Doughty are examples of such corroborating testimony." Pl.'s Resistance to Flying J Inc.'s Mot. for J. in Its Favor as a Matter of Law and Mot. for New Trial at 7. That the jury considered evidence of co-employee harassment against Flying J is evident in its award of $25,000 against Flying J on Plaintiff's sexually hostile work environment claim.

Plaintiff's loss on the constructive discharge claim reflects a failure of proof, not inadequate jury instruction on co-employee harassment. Plaintiff's proposed final instructions regarding co-employee harassment were unnecessary. The verdict on constructive discharge is "not against the great weight of the evidence," nor does it further a "miscarriage of justice." *White,* 961 F.2d at 780. Plaintiff's Motion for a New Trial is denied on this ground.

### 2. *Sexual behavior evidence*

As a second basis for a new trial, Beard asserts that the Court improperly admitted "sexual behavior" evidence under Federal Rule of Evidence 412. The challenged testimony came from Sarah Weindruch, a waitress at the Flying J restaurant in Davenport during the time period Plaintiff worked there as assistant manager. Weindruch testified that Plaintiff, while at work, would occasionally tell jokes of a sexual nature, or otherwise engage in sex-related conversation with other restaurant employees. *See* 3 Trial Tr. at 457–59.

The basis for Plaintiff's objection to Weindruch's live testimony comes from Rule 412. In civil cases, evidence offered to prove sexual behavior or sexual predisposition of an alleged victim is generally inadmissible. *See* Fed.R.Evid. 412(a). Such evidence, however,

> is admissible if it is otherwise admissible under these rules and its probative value substantially outweighs the danger of harm to any victim and of unfair prejudice to any party. Evidence of an alleged victim's reputation is admissible only if it has been placed in controversy by the alleged victim.

Fed.R.Evid. 412(b)(2).

■ As with certain common law privileges which parties can waive, the Court finds Plaintiff has waived her right to object to sexual behavior evidence admitted at trial, and thus the Court need not pass on the merits of Plaintiff's Rule 412 argument. The doctrine of waiver prevents a party from objecting to the introduction of evidence they themselves introduced. "The great weight of American authority supports the rule that a witness, who, in his direct examination, voluntarily opens an account of a transaction, will, on his cross-examination, be compelled to complete the narrative; and that he will not be allowed to state a fact and afterwards refuse to give the details." *Steen v. First Nat'l Bank,* 298 F. 36, 42 (8th Cir.1924) (quotes and citation omitted); *see also United States v. Workman,* 138 F.3d 1261,

1263 (8th Cir.1998) (in the context of attorney-client privilege, "waiver covers any information directly related to that which was actually disclosed") (citing 8 Charles A. Wright, Arthur R. Miller & Richard L. Marcus *Federal Practice and Procedure* § 2016.2).

In this case, evidence of Plaintiff's sex-related banter was contained within an exhibit the Plaintiff herself offered into evidence. *See* Pl.'s Ex. 1 (Mike Snider memo of 5/16/98). Over vigorous objection by both Krout and Flying J, the Court admitted this document into evidence. *See* 2 Trial Tr. at 92. Plaintiff's Exhibit 1 was a six-page internal business memorandum (authored by Flying J district manager Mike Snider), documenting the results of a company investigation into allegations of sexual harassment at the Flying J restaurant in Davenport. The memo showed what it was like to work at the Flying J restaurant with Krout as general manager. Several employees revealed their perceptions of Krout as their manager. Some Flying J employees accused Krout of engaging in sexually inappropriate behavior while at work. During her case-in-chief, Plaintiff read many of these second-hand statements to the jury.

Contained within the same internal memorandum, however, were unflattering statements about the Plaintiff. For example, Sarah Weindruch accused Plaintiff of engaging in "crud[e]" discussions with a "lot of sexual overtones." Snider's memo also quotes Ms. Weindruch as saying that Plaintiff once said, in response to a comment from a maintenance guy about striking her with a bat, "you don't want to do that I might like it." Pl.'s Ex. 1. Although it chose not to, Flying J could have elicited these testimonials from Plaintiff herself during its cross-examination of Plaintiff. *See, e.g.,* Amended Order on Final Pretrial Conference at 4 (both sides agreed that Snider's memo—Plaintiff's Exhibit 1—"may be used by any other party provided that party establishes the exhibit is otherwise admissible"). Instead, with Plaintiff having opened the door on Exhibit 1, Flying J, as part of its case-in-chief, called Ms. Weindruch to the stand wherein she testified to substantially the same matters attributed to her in Snider's memo. Since she was successful in admitting the whole of Exhibit 1 into evidence in the first instance, Plaintiff has waived her right to object to the adverse sexual behavior evidence contained therein.[5] *See Workman,* 138 F.3d at 1264 (parties cannot use privileged information "as both a shield and a sword"); *Johnson v. Richardson,* 701 F.2d 753, 756 (8th Cir.1983) (introduction of hearsay concerning the background of a witness was merely cumulative evidence given the witness's personnel file was introduced into evidence; even if testimony was inadmissible, its admission was harmless error).

■ Even were the Court to reach the merits of Plaintiff's Rule 412 argument, the Court would not order a new trial. By virtue of her claim that Flying J created an "unwanted" sexually offensive environment, *see* Second Amended and Substituted Compl. at paras. 9–10, Beard has placed in controversy these issues of workplace sexual conduct. *See* Fed.R.Evid. 412(b)(2) ("Evidence of an alleged victim's reputation is admissible only if it has been placed in controversy by the alleged victim."); *see also* Note, *Proving Welcomeness: The Admissibility of Evidence of Sexual History in Sexual Harassment Claims Under the*

---

5. Plaintiff has also waived her right to object to an incident disclosed by Weindruch on the stand that was not contained in Snider's memo. Weindruch testified at trial that Plaintiff and fellow employee Joe Simpson would play a game wherein Plaintiff would run her hand up Simpson's leg until he told her to stop. *See* 3 Trial Tr. at 457. Such evidence of sexual horseplay, while not contained in Mike Snider's memo, seems part and parcel of that memo's overall contents. Thus, this evidence of sexual horseplay is also deemed waived. *See United States v. Cote,* 456 F.2d 142, 145 (8th Cir.1972) ("disclosure effectively waived the privilege not only to the transmitted data but also as to the details underlying that information").

*1994 Amendments to Federal Rule of Evidence 412*, 48 Vand. L.Rev. 1155, 1202 (1995) (noting that "[t]he defendant's capacity to show that his advances were welcomed by the plaintiff is a material fact in sexual harassment litigation that may be proved circumstantially only by offering evidence of the plaintiff's sexually explicit conduct"). This evidence was relevant to the claim of a sexually hostile work environment. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 69, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) ("sexually provocative speech or dress" is "obviously relevant" in sexual harassment cases). The probative value of this evidence was not substantially outweighed by any harm or prejudice that may have resulted. That the pre-trial procedures set forth in Rule 412(c)[6] were not followed is harmless error, as the admission of this evidence was limited solely to certain instances of Plaintiff's workplace conduct, and did not extend to her non-workplace behavior. *Cf., e.g., Burns v. McGregor Electronic Indus., Inc.*, 989 F.2d 959, 962–63 (8th Cir.1993) (posing nude for a magazine outside work hours is not relevant to the issue of unwelcome sexually harassing conduct at work). These limited instances of Beard's workplace conduct related to sex were not sprung on Plaintiff at trial; their admission was briefed at length by the parties prior to trial and thoroughly considered and weighed by the Court. *See Myer–Dupuis v. Thomson Newspapers, Inc.*, 134 F.3d 371, 1997 WL 809955, at *2 (6th Cir. Dec.19, 1997) (unpublished opinion) ("Although the court did not follow the procedure stated in [Rule 412], both parties were aware of the testimony before it was presented and had ample opportunity to be heard regarding its admissibility.").

### 3. Unfair prejudice

As a third ground for new trial, Plaintiff argues that the Rule 412 evidence admitted did not substantially outweigh the danger of harm and unfair prejudice to her. This argument is foreclosed in light of the Court's earlier observations regarding the admissibility of this evidence at trial.

### 4. Failure to continue trial

Finally, Plaintiff argues that the Court abused its discretion in not continuing trial after Krout, during his deposition on April 11, 2000 (approximately 2 months prior to the start of trial), admitted that he worked at a Flying J restaurant in Sullivan, Missouri from July to December of 1996 and that a waitress there had accused Krout of "grabbing her crotch." Plaintiff requested, and the Court denied, a 90–day continuance to locate and depose the Sullivan, Missouri witness. Plaintiff's counsel undertook efforts to locate this mystery witness. The Court rejected Plaintiff's request for continuance as it believed a waitress in Sullivan, Missouri would have shed little light into how the Flying J restaurant in Davenport, Iowa was a sexually hostile or intolerable work environment. This testimony was duplicative of harassment evidence already being offered by the scheduled witnesses.

Plaintiff relies upon *Dabney v. Montgomery Ward & Co., Inc.*, 692 F.2d 49 (8th Cir.1982), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2429, 77 L.Ed.2d 1316 (1983), for the proposition that refusal to continue trial is

---

6. In relevant part, Rule 412 provides:
 (1) A party intending to offer evidence under subdivision (b) must-
 (A) file a written motion at least 14 days before trial specifically describing the evidence and stating the purpose for which it is offered unless the court, for good cause requires a different time for filing or permits filing during trial; and
 (B) serve the motion on all parties and notify the alleged victim or, when appropriate, the alleged victim's guardian or representative.
 (2) Before admitting evidence under this rule the court must conduct a hearing in camera and afford the victim and parties a right to attend and be heard. The motion, related papers, and the record of the hearing must be sealed and remain under seal unless the court orders otherwise. Fed. R.Evid. 412(c).

an abuse of the court's discretion when a critical witness not previously designated is located immediately prior to trial. In *Dabney,* a key defense witness emerged on the morning that trial in a design defect case was to commence. As support for the defense theory that an apartment fire was caused by plaintiff's smoking and not by an allegedly defective wall heater, the newly discovered witness was prepared to testify that plaintiff was drinking and smoking in a bar just an hour-and-a-half before the fire began. The Eighth Circuit held the district court abused its discretion in not continuing trial to accommodate this material witness.

■ Unlike this case, the witness in *Dabney* was identified; she was prepared to testify to a material issue in the case. Here, the Sullivan, Missouri waitress was never located. Assuming she had been found prior to trial, the Court believes her testimony would have said little about the conditions that existed at the Flying J restaurant in Davenport, Iowa. *See* 11 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2808 (1995) ("Newly discovered evidence that would merely affect the weight and credibility of the evidence ordinarily is insufficient for a new trial, as is evidence that is cumulative of evidence already offered.") (footnotes omitted). The Court, however, did permit Beard to cross-examine Krout about the Sullivan, Missouri incident. No doubt from Plaintiff's point of view, live testimony from this Missouri witness could have buttressed her case. But given the marginal relevance of this witnesses' putative testimony and its duplicative nature, the Court remains convinced that postponing trial would not have been justified.

7. Flying J also filed a motion for judgment as a matter of law on the issue of front pay which Plaintiff did not resist. Front pay becomes an issue when a plaintiff is fired or constructively discharged. Front pay may be awarded in lieu of, but not in addition, to reinstatement. *See Williams v. Valentec Kisco, Inc.,* 964 F.2d 723, 730 (8th Cir.1992), *cert. denied,* 506 U.S. 1014, 113 S.Ct. 635, 121

For the foregoing reasons, Plaintiff's motion for a new trial is denied.

**B. Flying J's motion for judgment as a matter of law and alternatively for a new trial**

Defendant Flying J moves, pursuant to Rule 50 of the Federal Rules of Civil Procedure, for judgment as a matter of law as to four separate issues: the first verdict form; hostile work environment; Flying J's affirmative defense; and punitive damages. Flying J has also moved for a new trial. The Court addresses each of these issues in turn.[7]

*1. Resubmission of the first verdict form*

Flying J moves for judgment as a matter of law on the jury's determination in the first verdict form absolving Flying J of sexual harassment liability. As explained above, the jury answered "No" to the question whether Beard had proven her case of a sexually hostile work environment against Flying J. Although this should have ended all further inquiry with respect to Flying J, the jury nevertheless proceeded to award damages. The jury's award of damages against Flying J was at odds with its underlying finding of no liability. "This was a logical inconsistency, and any attempt by the court to reconcile it would have required the court to speculate as to what the jury intended, and replace the jury's judgment with its own." *Karl v. Burlington Northern R.R. Co.,* 880 F.2d 68, 73 (8th Cir.1989) (citing *Smith v. Updegraff,* 744 F.2d 1354, 1368 (8th Cir. 1984)).

■ Flying J argues the original verdict was legally consistent and that the Court

L.Ed.2d 566 (1992). In this case, front pay is not at issue as the jury conclusively found that Plaintiff was not constructively discharged. Front pay damages were not assessed against Flying J, either by the jury or the Court. Flying J's motion for judgment as a matter of law on the issue of front pay is granted without further discussion.

lacked authority to resubmit the verdict form to the jury. It is settled law in the Eighth Circuit that the trial court enjoys "discretion to decide whether the jury's findings on the verdict forms were incomplete, confusing or inconsistent and whether to resubmit the issue to the jury." *Hauser v. Kubalak,* 929 F.2d 1305, 1308 (8th Cir.1991) (citations omitted). Whether it resubmits a special verdict, *see* Fed. R.Civ.P. 49(a), or a general verdict accompanied by answer to interrogatories, *see* Fed.R.Civ.P. 49(b), "the district judge, who has observed the jury during the trial, prepared the questions and explained them to the jury, is in the best position to determine whether the answers reflect confusion or uncertainty." *Id.* (quoting *Richard v. Firestone Tire & Rubber Co.,* 853 F.2d 1258, 1260 (5th Cir.1988)); *accord* 9A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2510 (1995) (choice to resubmit inconsistent verdict is "left to the court's discretion"). Faced therefore with the dilemma of an inconsistent verdict, the Court resubmitted the verdict form.

■ The Court emphasized on the second verdict form that if the jury answered "No" to the question whether Plaintiff proved the elements of a sexually hostile work environment claim against Flying J then they could **"NOT answer questions 2 or 3** [regarding constructive discharge, Flying J's affirmative defense, and damages]." (emphasis in original). The jury deliberated again. This time it returned a verdict that answered "Yes" to the question whether Plaintiff had proved the elements of a sexually hostile work environment claim against Flying J. The jury replicated its damage award against Flying J: awarding Beard $12,500 in compensatory and $12,500 in punitive damages. The Court is satisfied the second verdict was properly resubmitted to the jury, *cf. Smith v. Riceland Foods, Inc.,* 151 F.3d 813, 820–22 (8th Cir.1998),[8] and, as explained in the next section, reflects consistent determinations as to liability and damages. Flying J's motion for judgment as a matter of law regarding resubmission of the first verdict is denied.

*2. Prima facie case of sexually hostile work environment under Title VII*

Flying J moves for judgment as a matter of law that Plaintiff failed to prove all the elements of her prima facie case of sexual harassment under Title VII. Plaintiff argues there was ample evidence to support the jury's verdict against Flying J on her sexually hostile work environment claim.

■ To succeed on a hostile work environment claim created by her supervisor, Beard had to prove (1) she was subjected to conduct that created a hostile environment; (2) such conduct was unwelcome; (3) such conduct was based on Plaintiff's sex; (4) such conduct was sufficiently severe or pervasive that a reasonable person in Plaintiff's position would find Plaintiff's work environment to be hostile; and (5) at the time such conduct occurred and as a result of such conduct, Plaintiff believed her work environment to be hostile.

Plaintiff's case was anchored in allegations of sexual harassment by Krout her supervisor. Plaintiff described Krout's language as "foul and degrading." 1 Trial Tr. at 44. According to Plaintiff, Krout once bent over the countertop and said to her: "Just get it over with. Just give it to

---

8. In *Smith,* the jury found in favor of plaintiff on her Title VII retaliation claim, answered "yes" to the question whether employer would have fired plaintiff even if plaintiff had not filed an EEOC charge, and despite the court's instructions to the contrary, the jury awarded plaintiff damages. 151 F.3d at 820–21. The trial judge spoke to the jury in open court about the inconsistency in their verdict and sent them back to deliberate. *Smith,* 151 F.3d at 821. The jury returned the same verdict as before, except it answered "no" to the question whether employer would have fired plaintiff even absent an EEOC charge. *Id.* The Court held it was not an abuse of discretion in the manner in which court addressed the jury and instructed it on the inconsistency between its answer to the interrogatory and its award of damages. *Id.* at 822.

me up my ass and get it over with." *Id.* Plaintiff testified that Krout would "brush against," "bump," or "touch" her breasts "frequently." *Id.* at 45. She described at least three separate incidents wherein this conduct occurred. She testified, for example, that on or around April 9, 1998 while at work, Krout rubbed cooking tongs across the front of her breasts. *Id.* She did not report this particular incident to upper management right away because she was "stunned" and "scared." *Id.* at 46. She testified that on or around April 13, 1998 as she was coming out of the refrigerator or freezer, Krout flicked her nipple with a pen. *Id.* She testified that "every time he got even close to me, he would brush me, bump me, touch me." *Id.* at 46. She testified that on or around April 20, 1998 Krout touched her four times in the breasts. *Id.* at 49. After this April 20th incident, Plaintiff admitted she was "confused and scared, didn't know which way to turn, and I wanted confirmation that this was wrong and I wasn't seeing something that wasn't there." *Id.* at 49. Plaintiff testified she reported this encounter to the manager of the Flying J convenience store,[9] who in turn reported it to the convenience store's general manager. *Id.* at 50–51. Plaintiff also testified she reported Krout's behavior to Janice Litwiler, the general manager of the Flying J restaurant in Des Moines. 1 Trial Tr. at 56. Plaintiff concedes she did not report these incidents to Mike Snider, the district manager of Flying J restaurant, out of fear Snider would call Krout first. *Id.* at 53. On May 2, 1998, Beard finally told Krout "You continue to touch me, and I can't take this anymore. I can't deal with it. I'm not going to tolerate it." *Id.* at 62. Krout denied ever intentionally touching Beard's breasts; he conceded, however, that because of the cramped quarters of the restaurant, some contact with her breasts may have been accidental. *See* 3 Trial Tr. at 481–83.

Augmenting Plaintiff's case of sexually harassing conduct she herself experienced were allegations that Krout sexually harassed co-employees. Several former and current employees from the Flying J restaurant in Davenport told the jury about workplace encounters they had with Krout. Christie Ferring, a waitress at the restaurant, testified that on or around February 1998, Krout told her if she were not an employee, he would kiss her. *See* 2 Trial Tr. at 169. Two months after this incident, according to Ferring, Krout wrapped his legs around her and stated if she "ever just wanted to fuck, to give him a call." *Id.* Finally, Ferring testified that on May 12 or May 14, 1998, Krout "looked her up and down and then growled" at her in a sexually explicit way. *Id.* at 177. Krout denied all three incidents. *See* 3 Trial Tr. at 382–83. Ferring stated she "felt a little threatened, demeaned. I didn't feel safe in my work environment." *Id.* at 172. When Ferring relayed to Beard what Krout had done to Ferring, Beard "got sick[;] I went to the bathroom and threw up. I was crying. I was just really upset by the fact that it was still happening." 2 Trial Tr. at 102 (Plaintiff's testimony).

In addition to Christie Ferring's testimony, Betty Doughty, a former waitress, described two separate incidents involving Krout. The first occurred while Doughty and Krout were in the cramped quarters of the kitchen sometime in March of 1998: "I had dropped some kind of utensil on the floor, and I bent over and I picked it up, and just at that time [Krout] was on his way to do something that he had to go by me, and he come to a dead stop and he said, 'It's dangerous to bend over in front of me like that, you know.'" 2 Trial Tr. at 197. Doughty understood the remark as sexual in nature. *Id.* at 198. Krout explained that the remark was an expression of safety because at the time he was carrying a tray of food and Doughty bending over in front of him "could be dangerous." 3 Trial Tr. at 483.

---

9. Flying J facilities contain a convenience store, gas station, and a restaurant. *See* 1 Trial Tr. at 50. Plaintiff worked at the restaurant.

The second incident occurred two weeks later. Doughty asked Krout for help in clearing away a table. "I said 'My arms are just a little too short.' And [Krout] made the remark, 'Oh, I like short strokes, do you know what I mean?'" *Id.* at 198. Krout denied saying this. 3 Trial Tr. at 382. Doughty reported both incidents to the restaurant's then-assistant manager, Janice Litwiler. *See* 2 Trial Tr. at 198. According to Doughty, Litwiler took note of Doughty's complaints and stated: "This isn't the first time I've heard ... complaints [about Krout]."

The jury also heard from another Flying J waitress, Wendy Cervantes. She testified to two separate incidents involving Krout that occurred in late April or early May 1998. According to Cervantes, Krout stated "he would show me how to give good head." 3 Trial Tr. at 360. On another occasion, Cervantes' skirt was wrinkled and "he said it looked like I was in the lot fucking truckers." *Id.* Krout admitted noting Cervantes' wrinkled skirt, but denied the sexual reference to truckers. *Id.* at 484.

Plaintiff also called two former male employees to the stand. Lyle Straw, the former kitchen supervisor at the Flying J restaurant, testified that Krout gave him a "titty twister." 2 Trial Tr. at 211. Straw confessed such conduct was not a "big deal," but he still considered it "[in]appropriate." *Id.* at 213. The jury heard from another restaurant employee, Michael Scholbrock. He testified that Krout would make "sexual comments" like "she looks good" or "what I would like to do to that." *Id.* at 218. At one point, Krout told Scholbrock that Krout "was going to ... fuck me in my ass." *Id.* at 219. Krout denied these incidents involving Straw and Scholbrock. 3 Trial Tr. at 382–83.

Finally, Plaintiff sought to show that Flying J management, in retaining Krout as a manager within the company and dismissing her allegations of harassment,

failed to adequately respond to Krout's conduct. First, Flying J's district manager Mike Snider acknowledged the company policy against sexual harassment in the workplace; that it prohibited, among other things, calling, addressing or referring to any person by a demeaning name that relates to a person's sex; relating experiences, jokes or anecdotes that relate to sex; engaging in any conduct that tends to harass, annoy or inflame another employee based on sex. 2 Trial Tr. at 332. Snider testified that he personally believed the employees' accounts (as described above) of sexual harassment involving Krout. 2 Trial Tr. at 333–35. Snider believed that a warning, and not termination, was an appropriate response in light of employee allegations of sexually harassing conduct. *See* Trial Tr. at 336. Snider believed that Flying J had not violated its own anti-harassment policy by retaining Krout as the restaurant's general manager. *Id.* at 332.[10]

In addition to Snider's testimony, Plaintiff also introduced Plaintiff's Exhibit 3 which is a half-page corporate memorandum from Flying J's human resource manager, Dan Pessetto. This document, dated May 15, 1998, was the corporate response to Plaintiff' allegations of sexual harassment against Krout. In a short, tersely worded memo, Pessetto concluded: "Mike Snider findings in summation—Flagrant attempt to gather and rally a number of employees to get Rich out of unit.... No proof of Manager misconduct." Pl.'s Ex. 3. Pessetto wrote that after a "long telephone conference" with Mike Snider and another corporate official, there was "no evidence to suggest that Rich had done anything inappropriate." *Id.* When she learned this was the company's response, Plaintiff testified she felt "sick" and "violated" in that Flying J believed Krout over all the other employees. 2 Trial Tr. at 118. Krout resumed his work duties on May 20, 1998. Plaintiff quit the restaurant the same day.

---

10. Krout was eventually transferred to the Flying J restaurant in Clive, Iowa in early August of 1998 where he is currently the associate manager. *See* 3 Trial Tr. at 433.

There was also evidence which undermined Plaintiff's claims of sexual harassment. Both Flying J and Krout elicited evidence at trial of Plaintiff's workplace conduct. Janice Litwiler testified there was "a lot of squeezing, touching, ... kissing on the cheek, back rubs, neck rubs" between Plaintiff and Joe Simpson. 3 Trial Tr. at 440. And as mentioned earlier by the Court, there was evidence that Plaintiff told off-color jokes and engaged in sex-related conversations and horseplay. 3 Trial Tr. at 457–59.

Flying J called Mike Snider to the stand. Snider read from a two-page document that he wrote which memorialized the results of his visit to the restaurant on May 5, 1998. The document sets forth Plaintiff's accusations against Krout. The document ends by noting: "At this time Rich is fully aware that this behavior shall cease and desist from this day forward, and if any other substantiated charge of this type occurs, further disciplinary action will result.... *Deanna is satisfied with the results of this action*." Pl.'s Ex. 5 (emphasis added). Snider, Krout, and Plaintiff signed this hand-written docu-

ment. Consistent with the conclusion that Plaintiff was "satisfied" with this result, Flying J presented evidence suggesting that any issues with Krout since May 5, 1998 had been resolved. Snider testified that when he returned to the Flying J restaurant on May 16, 1998, Plaintiff stated she had no more problems with Krout. *See* 2 Trial Tr. at 310.

Finally, Flying J showed that Plaintiff did not follow the procedures in the company's employee handbook. The handbook lists several individuals whom an aggrieved employee may contact, and Plaintiff did not contact the people on the list. *See* Pl.'s Ex. 9 at 53 (Flying J handbook).[11] Plaintiff also failed to appeal the company's decision to retain Krout as the restaurant's general manager. Pursuant to the handbook, she could have contacted the company's general counsel or president.

The Court has reviewed all the admitted evidence and testimony in this case and finds that the jury reasonably concluded that Plaintiff proved her case of a sexually hostile work environment as against Flying J.[12] Through the testimony

11. An aggrieved employee could report problems to the supervisor's immediate supervisor, the plaza general manager, the district manager, the corporate human resource director, or the vice president. *See* 2 Trial Tr. at 287. The employee could also call the company's 1–800 fraud hotline to file an anonymous report. *Id.*

12. Without citing any authority, Flying J argues that a verdict against Flying J on the sexually hostile environment claim must fail if Krout did not sexually harass Plaintiff: "Plaintiff's *prima facie* case in this matter sank or swam based on the allegations of touching and foul language by Mr. Krout." Flying J's Reply to Pl.'s Resistance to Flying J's Mot. for J. as a Matter of Law and for New Trial at 1–2.

Eighth Circuit precedent does not so narrowly restrict a jury's verdict which absolves an individual agent of liability while holding the employer responsible. In *Polacco v. Curators of the Univ. of Missouri*, 37 F.3d 366 (8th Cir.1994), for example, the Eighth Circuit rejected the same theory Flying J now advances. "We have repeatedly held employers liable for employment discrimination," ex-

plained the Court, "even though their agents were absolved of personal liability—for example, when there was evidence of discrimination by agents who were not individual defendants, or when the discrimination was the product of an employer policy, custom, or practice." *Id.* at 369 (citations omitted). Here, when viewing the record in its entirety, and not withstanding the fact that the bulk of Krout's harassment stopped after May 5, 1998, there was evidence that Flying J's human resource director Dan Pessetto and district manager Mike Snider, in failing to deal harshly with Krout and officially dismissing Plaintiff's allegations against Krout as groundless, condoned sexually abusive behavior from one of its store's managers. Neither Pessetto nor Snider were named defendants in the case and the jury reasonably could have imputed their conduct to Flying J. *See* Preliminary Instruction No. 4 ("[A]ny agent or employee of the corporation may bind the corporation by the acts and declarations made while acting within the scope of the authority delegated to [them.]"). In short, the Court is satisfied that the law and facts support a finding of liability for Flying J even though Krout himself was not found liable."

of Plaintiff and certain of her co-workers, a reasonable jury could have concluded Plaintiff was subjected to conduct that created a hostile environment; that such conduct was unwelcome; that such conduct was based on Plaintiff's sex; that such conduct was sufficiently severe or pervasive that a reasonable person in Plaintiff's position would find the work environment to be hostile; and that at the time such conduct occurred and as a result of such conduct, Plaintiff believed her work environment to be hostile. It was for the jury to consider and weigh all the evidence in this case, including whether and to what extent evidence adverse to Plaintiff undermined her Title VII claim for relief. The Court cannot claim, as a matter of law, that the jury erred in finding Plaintiff had proven her Title VII case by a preponderance of the evidence. For these reasons, Flying J's motion for judgment as a matter of law on the merits of Plaintiff's Title VII case is denied.

### 3. Affirmative defense

The jury found that Flying J did not prove its affirmative defense. Thus, Flying J now moves for judgment as a matter of law on its affirmative defense. Consistent with *Faragher v. City of Boca Raton,* 524 U.S. 775, 805–07, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) and *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 763, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), the Court instructed the jury that in order to Flying J to succeed on its affirmative defense, it had to show by a preponderance of the evidence that: (1) Flying J exercised reasonable care to prevent and to correct promptly any sexually harassing behavior *and* (2) Plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities provided by Flying J or to otherwise avoid the harm.

■ Flying J made a credible case that it undertook prompt measures to correct problems of sexual harassment at the Davenport restaurant. Plaintiff signed a statement that she was "satisfied" with the results of Mike Snider's May 5, 1998 investigation. Outside Wendy Cervantes' allegation that Krout "growled" at her in a sexually suggestive manner on May 12 or May 14, 1998, there was little evidence to suggest that Krout continued to harass Plaintiff after Snider's May 5th visit. That said, however, the jury may have wondered why Krout continued on as manager of the restaurant in the face of multiple allegations from several co-employees that he engaged in sexually hostile behavior— allegations which the company's own district manager, Mike Snider, believed. Or, the jury may have wondered why the company's human resource head on May 15, 1998 dismissed the allegations against Krout as a meritless and "[f]lagrant attempt to gather and rally a number of employees to get Rich out of unit." Pl.'s Ex. 3. The jury, in other words, reasonably could have believed Plaintiff when she testified that as late as May 16th, the Flying J restaurant in Davenport, Iowa was still a sexually hostile work environment. *See* 2 Trial Tr. at 110. When viewing the *entire* record in a light most favorable to Plaintiff, the jury reasonably could have determined that Flying J did not demonstrate that it exercised reasonable care to prevent and to correct promptly any sexually harassing behavior. Thus, Flying J's motion for judgment as a matter of law on the affirmative defense is denied.

### 4. Punitive damages

■ Flying J also moves for judgment as a matter of law that the evidence was insufficient for the jury to assess punitive damages. Punitive damages are available if the employer "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). *Kolstad v. American Dental Assoc.,* 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999) clarified the burden a plaintiff must carry to prove malice or recklessness for purposes of 42 U.S.C. § 1981a(b)(1). Under § 1981a(b)(1), "[t]he terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that

it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Kolstad,* 527 U.S. at 535, 119 S.Ct. at 2124 (citation omitted). The Court held an employer must at least discriminate in the face of a "perceived risk that its actions will violate federal law" to be liable in punitive damages. *Id.* at 2125. The Court also held, however, that in the punitive damages context, "an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good-faith efforts to comply with Title VII." *Id.* at 2129 (internal quotes and citation omitted). These standards were accurately reflected in the Court's final instructions.

 In light of these standards and given the evidence presented at trial, a jury reasonably could have found Flying J acted with the malice and reckless indifference required by *Kolstad.* Taking the verdict in a light most favorable to Beard, the record reveals that Krout, on numerous instances, engaged in sexually harassing behavior directed at Plaintiff and her co-workers. Krout denied ever engaging in such conduct. He acknowledged that such conduct would constitute impermissible sexual harassment. Snider testified that he believed every employees' description of Krout's harassing behavior, admitted that sexual harassment laws were designed to protect individuals like Plaintiff against such conduct, and yet testified that warning Krout was an appropriate response. Finally, there was the short memo from Dan Pessetto dismissing Beard's allegations against Krout and suggesting that complaints against Krout were part of a conspiracy to "get Rich out of [the] unit." In the aggregate, this evidence reasonably reflects reckless indifference to Beard's right to be free from sexual harassment. The Court holds, therefore, that the punitive damage instruction was properly submitted and the jury's punitive damage award of $12,500

was adequately supported by the evidence.[13] *See Henderson v. Simmons Foods, Inc.,* 217 F.3d 612, 619 (8th Cir. 2000); *Ogden v. Wax Works, Inc.,* 214 F.3d 999, 1010 (8th Cir.2000). Flying J's motion for judgment as a matter of law on the punitive damages issue is denied.

### 5. New Trial

Flying J has moved for a new trial in the event the Court denies its motion for judgment as a matter of law. The Court finds that the jury's verdict in favor of Beard on her claim of a sexually hostile work environment is "not against the great weight of the evidence," nor does it further a "miscarriage of justice," *White,* 961 F.2d at 780. Flying J's Motion for a new trial is denied.

### C. Krout's post-trial motions

At the close of Plaintiff's case-in-chief, and again at the close of trial, Krout moved for judgment as a matter of law as to all claims asserted by Plaintiff Deanna Beard. Krout renews his motion for judgment notwithstanding the jury's verdict on all claims that were adverse to him.

### 1. Sexually hostile work environment under Iowa Code chapter 216

In light of the Court's earlier discussion approving the jury's original finding of no sexual harassment liability as against Krout, *see* page 4 of this Order, Krout's motion for judgment as a matter of law on this claim is granted. The jury's original finding absolving Krout of any liability and damages under Iowa Code Chapter 216 is affirmed.

### 2. Battery

 Krout asserts there was no substantial credible evidence to support the jury's battery verdict in Plaintiff's favor. To win her claim, Beard had to show by a preponderance of the evidence: (1) Krout

---

**13.** Flying J does not contest the jury's award of $12,500 in compensatory damages assessed against Flying J on Plaintiff's sexually hostile work environment claim. Thus, this compensatory damage award is affirmed.

made unwanted sexual advances toward Beard; (2) such acts were done with the intent to cause insulting or offensive bodily contact; (3) such acts resulted in insulting or offensive bodily contact; (4) such acts were a proximate cause of Beard's damage; (5) damages. The Jury was instructed that "[i]ntent" means doing something "on purpose as opposed to accidentally." Final Instruction No. 6A.

Beard's in-court testimony establishes elements 1 through 5. As set out above, *see* pages 18–19 of this Order, Beard testified that Krout touched or brushed against her breasts frequently. She described, for example, how Krout rubbed cooking tongs against her breasts and flicked her nipple with a pen. Beard stated she was offended and upset by these actions.

■■■ Krout denies this conduct occurred, and if it did, it was accidental and not intentional, and therefore not actionable. *See* Def. Krout's Br. in Support of Post–Trial Motions at 7. Apparently the Jury did not believe Krout, as was their right under the Court's instructions. *See* Preliminary Instruction No. 7 (advising that the jury was at liberty to believe all of what a witness said, part of it, or none of it). The Court also told the jury—in an instruction Krout himself submitted: "Because intent requires a finding of what a person is thinking when doing an act, it is seldom capable of being proven by direct evidence. You may use your common experience when considering all of the facts surrounding the doing of an act to determine what a person's intent was when committing the act." Final Jury Instruction No. 6A. The Court will not upset the jury's reasonable determination that Krout made unwanted sexual advances that were intentional and resulted in offensive bodily contact and emotional harm. Krout's motion for judgment as a matter of law on the jury's battery verdict is denied.

### 3. Compensatory damages

On the question of damages, Krout argues there was no substantial evidence to support the jury's award of $5,000 in compensatory damages against Krout. Plaintiff admits she was not physically injured by Krout's battery. And she readily concedes that her only basis for submitting compensatory damages to the jury was the emotional harm she suffered. Krout, however, maintains that emotional harm damages (like the kind Plaintiff is requesting) are only compensable when they are extreme or severe, and he cites to *Poulsen v. Russell*, 300 N.W.2d 289 (Iowa 1981) and *Vaughn v. Ag Processing, Inc.*, 459 N.W.2d 627 (Iowa 1990) to support this proposition. Because Beard did not show her distress to be severe or extreme, argues Krout, then Beard's award of emotional damages must fail.

*Poulsen* and *Russell* are inapposite cases and therefore not controlling. In those cases, plaintiffs alleged intentional infliction of emotion distress ("IIED"), which, under Iowa law, is a separate tort that requires a showing that plaintiff suffered, *inter alia,* "severe or extreme emotional distress." *See Poulsen,* 300 N.W.2d at 296; *Vaughn,* 459 N.W.2d at 635–36.

■■■ In this case, Beard did not try the tort of IIED to the jury. Instead she tried a battery tort which resulted in emotional injury. The emotional injury that flows from a battery tort (injury for which Plaintiff now seeks recovery) is completely different from the emotional distress injury that flows from the tort of IIED. As the Supreme Court put it, "our holding in *Poulsen* ... speak[s] to the independent tort of intentional infliction of emotional distress, rather than to damages from emotional distress that accompany the commission of another tort." *Niblo v. Parr Mfg., Inc.,* 445 N.W.2d 351, 356 (Iowa 1989). In *Niblo,* the Court stated: "We have been lenient in allowing incidental damages for mental distress in tort cases when the theory of recovery includes intentional acts...." 445 N.W.2d at 355. It further observed: "When the tort arises out of the willful act of the employer, an employee should not be limited to damages for only serious emotional distress. Under

**1095**

such circumstances we believe that factfinders can properly distinguish genuine from phony claims." *Id.* at 356.

In *Ayers v. Food & Drink,* 2000 WL 1298731 (Iowa Ct.App. Aug. 30, 2000), a sexual harassment case substantially similar to the one at bar, the Court affirmed a $15,000 compensatory damage verdict against the supervisor on plaintiff's battery count. *Id.* The Court noted that plaintiff, as in this case, suffered no physical injuries or loss of mental function as a result of the battery. *See id.* "Substantial evidence," noted the Court, "supports the jury's conclusion that Lynch intentionally touched Ayers in a manner that resulted in insulting and offensive bodily contact. The record reveals his actions were extremely offensive and upsetting to Ayers." *Id.* In this case, Plaintiff testified that after Krout touched her, she felt "stunned," 1 Trial Tr. at 45, "scared," *id.* at 46 "confused," *id.* at 49. As a result of Krout's actions, Plaintiff is "not the same person that [she] was." 2 Trial Tr. at 119. Along similar lines, she stated: "I don't feel the same about other people. I'm not trusting anymore.... I don't let people get close to me. Sometimes people make comments that I have to stop and think if it's sexually directed at me or if it's something different, and I don't let people get close to me anymore." *Id.*

 The jury was in the best position to decide whether and how much to award Plaintiff for what ostensibly were dignitary harms as a result of a sexual battery. Based on the substantial evidence, the jury awarded a reasonable sum in compensation for Krout's intentional conduct. *See Northrup v. Miles Homes, Inc.,* 204, N.W.2d 850, 860 (Iowa 1973) ("Placing a dollar amount on [mental and emotional harm] is peculiarly a function of the jury.") (citation omitted); Restatement (Second) of Torts § 905 cmt. i ("[T]here is no rule of certainty with reference to the amount of recovery permitted for any particular type of emotional distress; the only limit is such an amount as a reasonable person could possibly estimate as fair compensation."). Krout's motion for judgment as a matter of law as to the jury's award of $5,000 in compensatory damages against Krout is denied.

### 4. Punitive damages

 The Plaintiff is entitled to punitive damages only if she has shown "by a preponderance of clear, convincing and satisfactory evidence the defendant's conduct constituted a willful and wanton disregard for the rights or safety of another and caused actual damage to the plaintiff." Iowa Civil Jury Instruction No. 210.1. The Court believes there was sufficient evidence to submit this issue to the jury. The jury's award of $5,000 in punitive damages was a reasonable amount in light of the evidence adduced in this case. Krout's motion for judgment as a matter of law on the issue of punitive damages is denied.[14]

### 5. New trial

Krout moves for a new trial on Plaintiff's Chapter 216 claim and common law battery claim. Because the Court has already affirmed the jury's verdict absolving Krout of Chapter 216 liability, the Court will only address his motion as to the battery claim.

Krout seeks a new trial on the battery claim on the grounds that prejudicial error occurred at trial when the Court admitted

14. In sustaining the jury's award of $5,000 in compensatory and $5,000 in punitive damages on Plaintiff's battery claim, the Court reaffirms the validity of the second verdict with respect to this claim. Even were the Court to affirm the jury's original finding on the battery claim (i.e., $0 in compensatory and $10,000 in punitive damages), the Court would still uphold the $10,000 punitive damage award against Krout because Beard has made a sufficient showing of actual damages to support a punitive damage award. *See Westway Trading Corp. v. River Terminal Corp.,* 314 N.W.2d 398, 404 (Iowa 1982) (failure to award actual damages will not bar exemplary damages when actual damage has in fact been shown).

certain items into evidence. During trial, Krout objected to the admission of the following items of evidence: the testimony of Christie Ferring, Lyle Straw, Michael Scholbrock, Wendy Cervantes, and Carmen Doughty going to how Krout directed sexually explicit comments toward them; the references to the Sullivan, Missouri incident; party admissions by Flying J; and exhibits 1, 2, 3, 6, and 10.[15] He now renews those objections.

Krout's primary objection to this evidence is based on Federal Rule of Evidence 404(b).[16] Krout asserts that introduction of this second-hand evidence of prior bad acts impermissibly sought to prove that Krout was of the character to commit a sexually-related battery against Plaintiff. Additionally, Krout maintains that the Court's Rule 105 limiting instructions[17] during trial that evidence of co-employee harassment could be used against Flying J but not against Krout, see, e.g., page 8 of this Order, were insufficient; and that introduction of such evidence was more prejudicial than probative. See Fed.R.Evid. 403. Krout argues that because the introduction of this evidence affected his substantial rights, he should be afforded a new trial on the battery claim.

■ The Court does not believe that Krout's substantial rights were affected by the admission of the evidence outlined above. A jury is presumed to follow the instructions the Court gives to it. See United States v. Paul, 217 F.3d 989, 999 (8th Cir.2000). In this case, the jury relieved Krout personally of any sexual harassment liability under Iowa Code Chapter 216. That suggests the jury followed the Court's Rule 105 limiting in-

struction and only considered the co-employee testimony as against Flying J.

■ On the merits of Krout's Rule 404(b) argument, the Court properly admitted evidence of co-employee harassment. Prior bad act evidence is admissible if it is "offered to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed.R.Evid. 404(b). Once it is shown one of the exception applies, then evidence is admissible under Rule 404(b) if it is "(1) relevant to a material issue; (2) proved by a preponderance of the evidence; (3) higher in probative value than in prejudicial effect; and (4) similar in kind and close in time to the [event at issue]." Berry v. Oswalt, 143 F.3d 1127, 1132 (8th Cir.1998) (quoting United States v. Aranda, 963 F.2d 211, 215 (8th Cir.1992)).

In this case, Krout denied that he purposefully engaged in any sexually offensive or harassing conduct toward Plaintiff while working at the Flying J restaurant, and that if he did, it was accidental. Rule 404(b)'s exception was triggered because evidence of co-employee harassment was offered to show "absence of mistake or accident," or knowledge of sexual harassment. Such evidence was properly admitted because it refuted Krout's assertions of mistake; was proven by a preponderance of the evidence; was more probative than prejudicial; and was similar in kind and time to the events at issue (the alleged improper conduct by Krout all took place while he was general manager at the restaurant from January to May of 1998). Krout could have requested a separate trial on the battery claim and thereby

---

15. Respectively, these exhibits are: Mike Snider's memo of May 16, 1998; Christie Ferring's hand-written letter; Dan Pessetto's memo of May 15, 1998; Wendy Cervantes' hand-written letter; and a document prepared by Plaintiff's counsel of Plaintiff's harassment.

16. In relevant part, "[e]vidence of other ... wrongs, or acts is not admissible to prove the character of a person in order to show action

in conformity therewith." Fed.R.Evid. 404(b).

17. "When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly." Fed.R.Evid. 105.

avoid the effects of this evidence. *See* Fed. R. Civ. P 42(b) ("The Court, ... to avoid prejudice, ... may order a separate trial of any claim[.]"). For whatever reason he elected not to. Excluding all of this co-employee harassment evidence, as Krout wished the Court had done, would have compromised Plaintiff's Title VII case against Flying J. The evidence of co-employee harassment was properly admitted within the confines of Rule 404(b).

■ Additionally, the Court finds that this evidence was admissible as habit or pattern evidence under Federal Rule of Evidence 406. *Cf. Williams v. Anderson,* 562 F.2d 1081, 1087 n. 7 (8th Cir.1977). The co-employee harassment evidence was not more prejudicial than probative. Fed. R.Evid. 403. The jury's verdict in favor of Plaintiff on her battery claim against Krout was not "against the great weight of the evidence," *White,* 961 F.2d at 780, nor did it result in a "miscarriage of justice," *id.* Krout's motion for a new trial on the battery claim is denied.[18]

### D. Plaintiff's bill of costs

The Plaintiff requests $4,243.31 in costs. *See* Fed. R. Civ. P 54(d)(1); 28 U.S.C. § 1920. The Court has reviewed the amounts requested by Plaintiff and Flying J's objections thereto. Only some of the itemized costs needs to be reduced. For printing costs, the Court reduces the amount requested by 8%, from $626.47 to $576.35.[19] The Court will reduce the costs associated with the testimony of Dr. William B. Conway by $542.50, from $1,542.50 to $1,000. This approximately one-third reduction in Conway's costs reflects, according to Plaintiff's counsel's best guess, the amount of time Conway spent on the FLSA claim. Adding everything up, Plaintiff can recover $3,650.69 in costs.

### E. Plaintiff's motion for attorney's fees

■ The Court has reviewed the Plaintiff's request for attorney's fees. In civil rights cases, the attorney fee amount is generally determined by multiplying the reasonable number of hours spent on litigation by a reasonable hourly rate. *See Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). This is known as the lodestar amount. *See Casey v. City of Cabool,* 12 F.3d 799, 805 (8th Cir.1993), *cert. denied,* 513 U.S. 932, 115 S.Ct. 325, 130 L.Ed.2d 285 (1994) (citation omitted).

■ Reasonable fees are to be calculated according to the similar services by lawyers of reasonably comparable skill, experience and reputation in the relevant community. *See McDonald v. Armontrout,* 860 F.2d 1456, 1458–59 (8th Cir. 1988) (citing *Blum v. Stenson,* 465 U.S. 886, 895 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)). Plaintiff's counsel, Mr. Bittner, states that his billing rate is $175 per hour. There is nothing in the record to indicate how this hourly rate compares with other lawyers of comparable, skill, experience, and reputation in the community. *See also Hensley,* 461 U.S. at 430 n. 3, 103 S.Ct. 1933 (one of 12 factors to use in determining the proper fee is the "experience, reputation, and ability of the attorneys"). The record is insufficient upon which the Court could properly and intelligently measure a reasonable hourly rate for Mr. Bittner's efforts in this civil rights case.

Accordingly, the Court will defer ruling on Plaintiff's motion for attorney's fees. By separate Order, the Court will set a brief telephonic hearing solely on the ques-

---

**18.** Krout has moved under Rule 59(e) of the Federal Rules of Civil Procedure asking the Court to amend judgment in its favor on a number of issues. *See* Def. Richard Krout's Br. in Supp. of Post–Trial Motions at 11–14. Because the Court has already addressed these issues in this Order, it will not devote a separate discussion to them.

**19.** This reduction in 8% reflects that portion of the printing costs devoted to Plaintiff's unsuccessful FLSA claim. Plaintiff's counsel agrees that costs associated with the FLSA claim are not recoverable. *See* Pl.'s Modification of Request for Attorney's Fees at para. 3b.

tion of a reasonable hourly rate for this type of litigation.

## IV. Conclusion

Based on the foregoing,

Plaintiff's Amended Motion for New Trial on Constructive Discharge Claim (Clerk's # 156) is **DENIED**;

Defendant Flying J's Motion for Judgment as a Matter of Law and New Trial (Clerk's # 154) is **DENIED**;

Defendant Richard Krout's Motion for Judgment as a Matter of Law, Motion for Amendment of Judgment, Motion to Reinstate Original Verdict and Entry of Judgment as Matter of Law, and Alternative Motion for New Trial (Clerk's # 150) is **DENIED** in part and **GRANTED** in part;

Plaintiff is entitled to $3,650.69 in costs (Clerk's # 163);

Plaintiff's Submission of Attorney's Fee Bill on Sexually Hostile Environment Claim (Clerk's # 164) is deferred pending further input from the parties.[20]

**IT IS SO ORDERED.**

---

20. Plaintiff request to contact jurors (Clerk's # 186) is **GRANTED.**